## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

WESTERN WYVERN CAPITAL
INVESTMENTS LLC,

      Plaintiff,

v.                                                                    Case No. 8:22-cv-191-WFJ-SPF

BANK OF AMERICA, N.A.,

      Defendant.

_____/

## ORDER

Before the Court is Defendant Bank of America, N.A.'s ("BANA") Motion for Summary Judgment (Dkt. 118; Dkt. S-129). Plaintiff Western Wyvern Capital Investments LLC ("WWCI") has responded in opposition (Dkt. 144; Dkt. S-148-1), and BANA has replied (Dkt. 154; Dkt. S-157). On May 22, 2024, the Court held a hearing on this matter. Upon careful consideration, and with the benefit of able argument by both sides, the Court grants BANA's Motion.

## BACKGROUND

The instant lawsuit focuses on BANA's decision to place a freeze and subsequent legal hold on WWCI's bank account. WWCI contends that BANA's actions were improper and cost WWCI millions of dollars in lost investment value. BANA maintains that it was merely exercising its contractual rights in good faith.

## I.     The Investment Idea

Sreedhar Veeramachaneni is the owner and chief executive officer of System Soft Technologies ("SST"). Dkt. 120-2 at 6–7. Around 2019, he was made aware of a potential investment opportunity in an Indian mining company called Vijay Mining Private Limited ("Vijay Mining"). *Id.* at 22–23. Despite indications that Vijay Mining was in a poor financial position, Mr. Veeramachaneni was interested in learning more. *Id.* at 22.

Around 2020, Mr. Veeramachaneni flew to India to meet with Vijay Mining Director Dushyant Reddy. *Id.* at 23. Mr. Reddy explained that Vijay Mining was interested in opening up silica sand mining operations but needed capital. *Id.* Mr. Reddy did not ask Mr. Veeramachaneni for a concrete investment at this time. *Id.*

Things got more serious when Mr. Veeramachaneni flew back to India to meet with Mr. Reddy in 2021. *Id.* During this meeting, and through subsequent communications, Mr. Veeramachaneni learned that Vijay Mining was seeking to open silica mining operations in both Muddanur and Kurnool, India (collectively, the "Mining Sites"). *Id.* at 30–31. Ultimately, Mr. Veeramachaneni was asked to invest $10,000,000. *Id.* at 30.

Mr. Veeramachaneni eventually agreed to invest on "gentlemen's terms." Dkt. 120-7 at 7. He verbally committed $4,000,000 to Kurnool and $6,000,000 to Muddanur. Dkt. 120-2 at 31. No written agreement was executed until 2022.

## II.     The Investment Process and BANA Holds

On September 21, 2021, Mr. Veeramachaneni formed WWCI as an investment vehicle to make good on his commitment to Vijay Mining. Dkt. 120-4 at 64. Shortly thereafter, he went to a BANA location in Tampa, Florida, and opened a WWCI consumer banking account (the "Account") with an associate named Kari Pettaway. Dkt. 120-2 at 33; Dkt. S-129-7 at 10. While Mr. Veeramachaneni and Ms. Pettaway disagree about the specifics discussed during this meeting, they agree that Mr. Veeramachaneni indicated investment as the Account's primary purpose. *Compare* Dkt. S-129-7 at 12 *with* Dkt. 120-2 at 33.

Opening the Account involved executing a signature card and a Deposit Agreement (the "Agreement"). *See generally* Dkt. 42-1. With respect to account freezes, the Agreement provides the following:

> If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent or illegal activity, we may, in our discretion, freeze some or all of the funds in the account and in other accounts you maintain with us, and/or delay transactions, without any liability to you, until such time as we are able to complete our investigation of the account and transactions. If we do freeze your account funds or delay transactions, we will provide notice to you as soon as reasonably possible. Notice may be made by mail or verbally or provided by other means such as via Online Banking or text alerts as permitted by law or by updated balance information. We may not provide this notice to you prior to freezing the account or delaying transactions if we believe that such notice could result in a security risk to us or to the owner of the funds in the account. The Bank will not be liable for any costs or fees incurred by the delay.

*Id.* at 63–64. The Agreement's subsequent provision states in part that, "except as limited by applicable law, [BANA] [is] not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind." *Id.* at 64.

Approximately one week after the Account was opened, it began receiving wire transfers. By the end of October 18, 2021, the Account had received over $1,600,000. Dkt. S-129-2 at 37. These initial investment funds apparently came directly or indirectly from Mr. Veeramachaneni himself. *Id.*

On October 14, 2021, Mr. Veeramachaneni visited a BANA retail location in Los Angeles, California, which had no prior connection to the Account. Dkt. S-129-1 at 13; Dkt. S-147-1 at 11. He executed a second signature card and attempted to wire $1,000,000 from the Account in Los Angeles to a Vijay Mining account at HDFC Bank Limited in India. Dkt. S-129-13 at 9, 19–29. Unfortunately, BANA employees in Los Angeles were unable to locate Mr. Veeramachaneni's original signature card. *Id.* at 9. The $1,000,000 outgoing wire was therefore rejected. BANA employee Matthew Aragon also filed a "TRMS" report noting suspicious activity. *Id.* at 19–20. BANA's suspicions were raised as set forth in the margin.[1]

---

[1] According to Matthew Young, a BANA employee in fraud detection, a "TRMS" or "transaction reporting management system" report is "an internal document that is filled out when there is suspicious activity occurring on an account or suspicious client behavior[.]" Dkt. S-129-10 at 12. Mr. Aragon's TRMS report noted "potential money laundering" due to "[a]ccounts just opened . . . in Florida with a F[lorida] address. Business had 2 wires come in[:] [one] on 10/12/21 for 500k[,] and [one on] 10/13/21 for 505k. [C]lient wanted to wire 1 million .

The following day, Mr. Veeramachaneni was back in Tampa, Florida. That day he visited the BANA location where he opened the Account and once again attempted to wire $1,000,000 to Vijay Mining. Dkt. S-129-1 at 14; Dkt. S-147-1 at 11. The wire was authorized. Dkt. S-129-2 at 37. And, over the next couple of weeks, the Account received three wires from investors totaling $1,500,000. *Id.*

It was not long before another issue arose. Sometime after receiving the aforementioned $1,500,000, Mr. Veeramachaneni contacted a BANA location in Dunwoody, Georgia, looking to schedule an in-person appointment to wire another $1,000,000 to Vijay Mining. Dkt. S-129-14 at 28–29. Again, this location was new and not previously connected to the Account. Mr. Veeramachaneni also informed the associate that he did not want to disclose the purpose of the investment/wire over the phone. *Compare* Dkt. S-129-1 at 14 *with* Dkt. S-147-1 at 11. This apparently caused suspicions and led the associate to review the Account before contacting her supervisor, Bianca Baptiste. *Id.* at 30.

Upon reviewing the Account, Ms. Baptiste became concerned that it was possibly being used for illegal means. *Id.* Ms. Baptiste consequently called BANA's "Fraud-in-Progress" hotline and spoke to Kimberly Williams. *Id.* Ms. Williams, a member of BANA's Fraud Detections Operations Department

---

. . . redetected by BAT due to missing sig[nature] cards. Upon asking about business client got nervous and stated it was for "Emerging Market Investments[.]" Dkt. S-129-13 at 19–20 (cleaned up).

("FDOD"), reviewed the Account, initiated a 60-day "888 hold" (the "Freeze"), and instructed Ms. Baptiste to file a TRMS report. Dkt. S-129-15 at 11, 20; Dkt. S-129-14 at 49. BANA contends that the Freeze was placed due to irregular activity, wires originating from multiple, apparently unrelated BANA locations across the country, and Mr. Veeramachaneni's purported unwillingness to discuss the transfers. Dkt. S-129-1 at 15. BANA further maintains that it notified Mr. Veeramachaneni of the Freeze and explained that the Freeze would likely expire on January 24, 2022. *Compare* Dkt. S-129-1 at 16 *with* Dkt. S-147-1 at 12.

After placing the Freeze, multiple BANA departments investigated the Account. The initial investigation was performed around the first week of November 2021 by Frank Collins in BANA's FDOD. Dkt. S-129-16 at 11. Mr. Collins reviewed the Account for fraud and ultimately concluded that the Account should be further investigated due to unmitigated risk. *Id.* at 12. Accordingly, he submitted another TRMS report, noting various large, round-dollar wires, and left the Freeze in place. *Id.* at 83.

The second investigation was performed later in November 2021 by Leticia Zavala. Ms. Zavala, an employee of BANA's Anti-Money Laundering Department ("AMLD"), reviewed the Account's activity and prior TRMS reports. Dkt. S-129-17 at 199–203. She verified that the Account's "activity appear[ed] excessive for the type of account" and that the "purpose and the relationship between the parties

6

to the transactions and economic purpose of the transactions [was] unknown." *Id.* at 93, 203. She did not, and apparently could not herself, lift the Freeze. *Id.* at 33.

The final "investigation" was performed in December 2021 by Pamela Schneider, a BANA employee in the Fraud Investigations Department ("FID"). *Compare* Dkt. S-129-1 at 18 *with* Dkt. S-147-1 at 13. It does not appear that Ms. Schneider reviewed any new information or reached any new conclusions. *See* Dkt. S-129-10 at 326–30. She instead essentially rerouted Mr. Collins' report to another department. *Id.* at 64. Notwithstanding, BANA contends that it generally maintains its standard 60-day freeze until expiration in order to ensure enough time for potentially defrauded third parties to make claims. Dkt. S-129-1 at 19.

On January 24, 2022, the Freeze expired. Mr. Veeramachaneni filed suit the same day. *See* Dkt. 1. BANA's legal team therefore placed a legal hold (the "Litigation Hold") on the Account on January 27, 2022, which was then lifted on February 23, 2022. Dkt. S-129 at 21; Dkt. S-147-1 at 15.

### III.   The Alleged Investment Loss

In February 2022—presumably after the Freeze expired but before the Litigation Hold was lifted—WWCI and Vijay Mining finally executed a written Share Subscription and Shareholders Agreement (the "SSHA"). Dkt. S-129-1 at 21; *see also* Dkt. 120-10 at 155–93. The SSHA called for four tranche payments: (1) approximately $890,000 before October 30, 2021; (2) approximately $395,000

7

before November 30, 2021; (3) approximately $443,000 before December 31, 2021, and (4) approximately $7,255,000 to be made in various sub-tranches based on certain milestones. *Id.* at 163. WWCI timely made the first three payments along with untimely portions of the fourth tranche, but it appears that Mr. Veeramachaneni was required to take loans from his company in order to do so. Dkt. S-129-1 at 21; Dkt. S-147-1 at 15. In total, WWCI has invested $6,175,000 in Vijay Mining. Dkt. 120-22 at 125.

WWCI maintains that BANA's actions significantly hampered Vijay Mining's sand mining operations. WWCI avers that, "but for the wrongful actions of [BANA] as to the [Freeze]," WWCI would have raised $10,000,000 by December 31, 2021, and Vijay Mining "would have had sufficient capital . . . to implement its business plan and generate cash flow such that [WWCI] would have received the benefit of its bargain." *Id.* at 126. WWCI claims that its investment is now worth $860,000, and that it is entitled to $5,315,000 as the difference between its $6,175,000 investment and its investment's current worth under a "diminution of value" analysis. *Id.* at 125.

## IV. The Instant Lawsuit

On April 15, 2022, WWCI filed its Amended Complaint. *See* Dkt. 25. Therein, WWCI asserts four counts: Count I—intentional interference with an advantageous business relationship; Count II—breach of the implied covenant of

8

good faith and fair dealing; Count III—breach of contract; and Count IV—promissory estoppel, as an alternative to breach of contract. *Id.* at 21–30. BANA now moves for summary judgment as to each of these claims. *See* Dkt. S-129.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

The Court will address WWCI's tortious interference claim before turning to consider the Agreement and WWCI's contract-related claims.

### I.     Tortious Interference (Count I)

"[T]he elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citations omitted).

10

"The law in Florida is clear [t]hat there is no such thing as a cause of action for interference [with a contractual or advantageous business relationship] which is only negligently or consequentially effected." *Ingenuity, Inc. v. Linshell Innovations Ltd.*, No. 6:11-CV-93-ORL-28-KRS, 2014 WL 1230695, at *4 (M.D. Fla. Mar. 25, 2014), *aff'd*, 644 F. App'x 913 (11th Cir. 2016) (citations and internal quotations omitted) (alterations in original). Accordingly, "[t]he plaintiff must plead and prove that the defendant manifested a specific intent to interfere with the business relationship." *Id.* at *4 (citations and internal quotations omitted).

WWCI has failed to raise a material issue of fact as to whether BANA had knowledge of WWCI's relationship with Vijay Mining. Throughout the briefings presented to the Court, the parties have made clear that they hold different views concerning Mr. Veeramachaneni's willingness to discuss the purpose of WWCI's wires. WWCI suggests that any perceived reluctance was due to Mr. Veeramachaneni not wanting to discuss matters over the phone, Dkt. S-147-1 at 11, or not being asked for more details, *id.* at 8. What WWCI does not allege, however, is that Mr. Veeramachaneni actually informed BANA that the wires were related to a business relationship between WWCI and Vijay Mining. Indeed, there is no evidence that BANA even knew of Vijay Mining's existence beyond BANA's hypothetical ability to track Vijay Mining's connection to the Indian bank account that received WWCI's October 15, 2021, wire. But this doesn't appear to

have happened. During her investigation, Ms. Zavala specifically verified that the "purpose and the relationship between the parties to the transactions and economic purpose of the transactions [was] unknown." Dkt. S-129-17 at 203. Without any evidence to the contrary, Count I is unsustainable.

WWCI also fails to establish the third element of tortious interference. "To be liable for tortious interference, the offending party's interference must be both direct and intentional." *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334, 1340 (S.D. Fla. 2007) (internal quotations and citations omitted). Further, "a plaintiff must establish the defendant's intent to interfere, as opposed to the defendant's mere intent to act." *Maxi-Taxi of Fla., Inc. v. Lee Cnty. Port Auth.*, No. 2:07-CV-82FTM34SPC, 2008 WL 1925088, at *16 (M.D. Fla. Apr. 29, 2008), *aff'd*, 301 F. App'x 881 (11th Cir. 2008) (cleaned up).

Here, "[a]lthough [BANA] intended to freeze the [A]ccount, there is no evidence that it intended to interfere with any of [WWCI's] business relationships." *MKT Reps S.A. DE C.V. v. Standard Chartered Bank Int'l (Americas) Ltd.*, 520 F. App'x 951, 955 (11th Cir. 2013) (affirming dismissal of a tortious interference claim where the defendant bank froze the plaintiff's funds). This means that, even if BANA did know of Vijay Mining's existence, the Court could not find that BANA's actions constituted tortious interference at trial. *First Title of Am., Inc. v. Truist Bank*, No. 1:20-CV-21787-UU, 2020 WL 13042833, at

12

*4 (S.D. Fla. Aug. 5, 2020) (dismissing tortious interference claim where the plaintiff "alleged nothing to show that by 'freezing' [the plaintiff's accounts], [the defendant] acted with any intent to affect [the plaintiff's] alleged business or contractual relationships"). The Court therefore grants BANA summary judgment on Count I.[2]

## II.    Breach of Contract and the Implied Covenant (Counts III and II)

Breach of contract requires: (1) the existence of a contract; (2) a [material] breach of that contract; (3) causation; and (4) damages. *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am.*, 611 So. 2d 564, 565 (Fla. 4th DCA 1992). "In order to allege a material breach in accordance with the pleading standards required under the Federal Rules of Civil Procedure, the plaintiff must allege which provision of the contract has been breached." *Stepakoff v. IberiaBank Corp.*, 637 F. Supp. 3d 1309, 1313 (S.D. Fla. 2022) (internal quotations and citation omitted). It follows that, at the bare minimum, a plaintiff must allege that the applicable contract has been breached.

In addition to written provisions, every contract under Florida law also contains "the terms and matters which, although not actually expressed, are

---

[2] It is also worth noting that "no cause of action for intentional interference exists which is the consequence of a rightful action." *Textron Fin. Corp. v. RV Having Fun Yet, Inc.*, No. 3:09-CV-2-J-34TEM, 2011 WL 13176212, at *5 (M.D. Fla. Aug. 3, 2011) (internal quotations and citation omitted). As the Court will explain, BANA's actions in freezing the Account were not a breach of contract or the implied covenant of good faith and fair dealing. Count I fails for this reason as well.

implied by law[.]" *First Nationwide Bank v. Fla. Software Servs., Inc.*, 770 F. Supp. 1537, 1542 (M.D. Fla. 1991). This includes the implied covenant of good faith and fair dealing, which ensures that each party to a contract performs "their part of the bargain in good faith[.]" *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999) (internal quotations and citation omitted) "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005).

### a. WWCI's Breach Theories (Count III)

Count III does not allege a breach of the Agreement—the contract which unquestionably governs the Account. Early in this lawsuit, BANA moved to strike the Amended Complaint's demand for a jury trial, *see* Dkt. 42, citing the Agreement's jury waiver provision, Dkt. 42-1 at 81. WWCI argued that the Agreement did not control and that, even if it did, the jury waiver provision was invalid. *See generally* Dkt. 46. Ultimately, the Court resolved both issues in BANA's favor. Dkt. 64 at 1–4. The Court explained that, "[o]n two separate occasions, [Mr. Veeramachaneni] executed a one-page Business Signature Card that expressly states that [the Account] is governed by the terms of the [Agreement]." *Id.* at 2 (citing Dkt. 42-1 at 5–6). Notwithstanding this clear ruling,

14

WWCI never filed a second amended complaint. It instead proceeded with its Amended Complaint, which wholly focuses on and attaches the parties' Fund Transfer Agreement ("FTA") and Business Advantage Relationship Banking document ("BARB"). *See generally* Dkt. 25; Dkt. 25-1 (the FTA and BARB).[3]

The problem with this decision is obvious. The FTA does not address account freezes or holds, and the BARB is merely an overview that directs its signatories back to the Agreement. Dkt. 25-1 at 3–5. Neither is applicable to WWCI's breach theories, which focus on an account freeze. Dkt. 25 at 24–28. Although WWCI recognizes as much now, *see* Dkt. S-148-1 at 6, it is too late to file a second amended complaint. *See Whittington v. Whittington*, No. 6:19-CV-1631-ORL-40-DCI, 2020 WL 8224604, at *2 (M.D. Fla. Oct. 23, 2020) (denying motion to amend pleadings after the case management deadline where no good cause existed). Count III is due to be dismissed for this reason alone.

All the same, a second amended complaint would not have allowed WWCI to avoid summary judgment. With the substitution of the Agreement for the FTA and BARB, the Amended Complaint's only stated breach theory is that BANA "materially breached the [A]greement's obligation to provide information concerning the reasons for the [Freeze] on a reasonably prompt basis." Dkt. 25 at 25. There are multiple substantive issues with this claim.

---

[3] There can be no doubt that WWCI's Amended Complaint focuses on the FTA and BARB where it argued as much in its opposition to BANA's Motion to Dismiss. *See* Dkt. 31 at 2–3.

As an initial matter, the Agreement provides that BANA "may not provide . . . notice to you prior to freezing the [A]ccount or delaying transactions if we believe that such notice could result in a security risk to us or to the owner of the funds in the account." Dkt. 42-1 at 64. BANA had reason to believe that advance notice could pose a risk because the Account demonstrated unusual and "possib[ly] fraud[ulent] activity[.]" Dkt. S-129-10 at 310. No reasonable factfinder could believe that BANA was acting in bad faith in coming to this conclusion. BANA employees in both California and Georgia independently thought it necessary to file TRMS reports concerning the Account—it was receiving large, round dollar wires; Mr. Veeramachaneni was flying back and forth across the country attempting to wire millions of dollars to India; and, for whatever reason, Mr. Veeramachaneni never gave BANA employees an explanation of his unusual movements or the connection between the locations of his wires. BANA's failure to provide advance notice does not constitute a breach or bad faith.

What is more, BANA provided verbal notice to Mr. Veeramachaneni within one day of the Freeze. The Freeze was placed on October 29, 2021. Dkt. S-129-15 at 15; Dkt. S-129-16 at 11, 78. Mr. Veeramachaneni was "told by Atlanta that the funds [were] on hold" and that he could not complete a requested wire the very same day. Dkt. 120-2 at 38. He was also provided further information about the

16

cause of the Freeze—which is not required by the Agreement—within another 30 days. Dkt. 120-2 at 39–40; Dkt. S-129-5 at 2.

Assuming that the Agreement's notice clause even applies in cases where preemptive notice is not required, the question then becomes how to reconcile an obligation to provide notice "as soon as reasonably possible" with an express right to "not provide notice" where risk is involved. Dkt. 42-1 at 64; *see Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1254 (S.D. Fla. 2017) (explaining that "courts must strive to interpret a contract in such a way as to give meaning to all provisions while doing violence to none"). There is only one answer that gives harmonious meaning to these provisions; that is, the contract between the parties. Under the Agreement, BANA must provide notice as soon as it reasonably believes that such notice will not "result in a security risk to [BANA] or to the owner of the funds in the account." Dkt. 42-1 at 63–64. BANA clearly did not breach this duty. Mr. Veeramachaneni was provided notice of the Freeze before BANA's primary investigation had even begun.

Equally unavailing are WWCI's newly stated express breach theories. WWCI now argues at the summary judgment stage that BANA breached the Agreement by: (1) freezing the account with no legitimate basis for doing so; and

(2) refusing to close the Account after the Freeze was placed. Dkt. 148-1 at 6–9.[4]

The Court will address each claim in turn.

BANA had a reasonable basis for placing the Freeze. As previously mentioned, the Agreement provides that:

> If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent or illegal activity, we may, in our discretion, freeze some or all of the funds in the account and in other accounts you maintain with us, and/or delay transactions, without any liability to you, until such time as we are able to complete our investigation of the account and transactions.

Dkt. 42-1 at 63–64. The record is clear that the Account was subject to irregular activity which BANA believed may demonstrate fraud or money laundering—i.e., "fraudulent or illegal activity." It was therefore within BANA's contractually granted discretion to place the Freeze. Of course, the Court recognizes that "where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously and contravene the reasonable contractual expectations of the other party." *Cox*, 732 So. 2d at 1097–98. But no factfinder could find that

---

[4] WWCI cites to paragraphs two, three, and seventeen of the Amended Complaint for the proposition that it did assert these breach theories. Dkt. S-148-1 at 6. None of these background paragraphs, however, are incorporated into Count III. *Id.* at 24–28. Either way, ignoring the fact that WWCI did not even allege a breach of the Agreement, the Court finds that these new claims are related closely enough to WWCI's stated breach theory to warrant consideration. *See Havana Docks Corp. v. Carnival Corp.*, 592 F. Supp. 3d 1088, 1151–52 (S.D. Fla. 2022) (finding that the plaintiff's summary judgment theory did not exceed the scope of its pled theory where new facts were intimately related to said theory and the allegations fell within the same statute identified in the pleading).

BANA acted capriciously and in bad faith simply by freezing the Account. The Account unquestionably exhibited red flags, even after BANA's initial pre-Freeze reviews, and BANA had a right to freeze it pending a complete investigation. There is nothing in the record that supports an inference of capricious behavior.

BANA was also within its contractual rights when it refused to close the Account during the Freeze. The only support for WWCI's argument to the contrary is the following Agreement provision: "[y]ou or we may close your checking or savings account at any time without advance notice, except that we may require you to give us seven days advance notice when you intend to close your . . . account by withdrawing your funds." Dkt. 42-1 at 15. This language, however, cannot be read in isolation. *See U.S.B. Acquisition Co. v. Stamm*, 660 So. 2d 1075, 1080 (Fla. 4th DCA 1995) (explaining that "[e]very provision in a contract should be given meaning and effect and apparent inconsistencies reconciled if possible"). Such a reading eviscerates BANA's rights under the freeze provision by rendering it wholly superfluous. Indeed, if a depositor could simply close its account or continue withdrawing funds during an account freeze, the freeze would be wholly symbolic, and BANA would lose its ability to protect itself and third parties from fraud. The Court will not adopt such an illogical interpretation of the Agreement. A temporary account freeze naturally freezes a depositor's control over their account.

Any other understanding would contravene basic cannons of contract interpretation by doing unnecessary violence to the Agreement's freeze provision.

### b.  WWCI's Implied Covenant Theories (Count II)

WWCI next argues that material issues of fact exist in relation to whether BANA acted in good faith concerning: (1) the length of the Freeze; (2) the investigation; and (3) the Litigation Hold. Dkt. S-148-1 at 12. The Court disagrees for the reasons expressed below.

Because the Agreement states that BANA may "freeze some or all of the funds in the [A]ccount . . . until such time as [BANA] [is] able to complete [an] investigation of the [A]ccount and transactions[,]" WWCI's first two implied covenant claims essentially collapse into a question of whether BANA's standard 60-day Freeze investigation was conducted in good faith and in accordance with commercially reasonable standards. *See Cox*, 732 So. 2d at 1098 (noting that "the implied obligation of good faith cannot be used to vary the express terms of a contract"). WWCI claims that it was not because BANA was not meaningfully investigating the Account and was in part just waiting for possible third-party claims. *See* Dkt. S-148-1 at 10–12. WWCI further contends that a standard 60-day freeze is itself not commercially reasonable. *Id.*

Contrary to WWCI's assertions, the undisputed facts show that BANA did meaningfully investigate the Account and its transactions. On October 29, 2021,

Ms. Williams froze the Account after the chain of events described in the Background Section of this Order. She subsequently indicated the following in BANA's internal note system: "[n]ew account receiving multiple large wires followed by rapid movement. Customer called the fc and wants to wire out one million dollars. When asked by the fc what the wire was for[,] he stated 'I['d] rather not say over the phone.' Please review[.]" Dkt. S-129-16 at 78.[5]

Days later, on November 1, 2021, Mr. Collins of the FDOD began his investigation of the Account. *Id.* at 13.[6] Mr. Collins noted "to-me-from-me wire activity," *id.* at 14, and specifically indicated "possible fraud activity from himself to business account here at [BANA]" in his subsequent TRMS report, *id.* at 84. Mr. Collins explained that, in addition to the rapid movement of significant funds in a brand new account as well as other indicators, such to-me-from-me activity can be demonstrative of money laundering or other illegal activity. *Id.* at 14. Mr. Collins further explained that he could not "pinpoint whether or not [the transactions were valid]" and that he consequently could not remove the Freeze. *Id.* at 16.

BANA got a second opinion on the nature of the Account's activity from Ms. Zavala in the AMLD, whose job involves independently reviewing TRMS

---

[5] "fc" appears to stand for "financial center," such as the "Dunwoody, Georgia, financial center." *See* Dkt. S-129-15 at 5, 12, 15.

[6] WWCI claims that Mr. Collins only investigated the account for one minute based on an early statement he made during his deposition. Dkt. S-148-1 at 4; A full reading of Mr. Collins' deposition makes clear that this statement was a mistake, and that WWCI's counsel recognized as much. Dkt. S-129-16 at 17.

reports and account activity to determine whether or not a suspicious activity report ("SAR") should be filed. Dkt. S-129-17 at 37–48. Ms. Zavala conducted her investigation on November 29, 2021. *Id.* at 55. While a large part of her testimony was disrupted by her inability to discuss SAR-privileged matters, *id.* at 70, Ms. Zavala explained that she reviewed and verified Account activity that was brought to her attention by earlier reports and BANA's automated large wire transaction monitoring software ("WIAT"). *Id.* at 82–95. She concluded that the "[w]ire activity appears excessive for recently opened account." *Id.* at 203. Her supervisor approved her report and investigation the same day. *Id.* at 56.

There is no factual evidence that suggests that this initial 30-day segment of the Freeze was unreasonable or involved a bad faith investigation. *See Crawford-El*, 523 U.S. at 600 (explaining that the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute). In opposing this conclusion, WWCI notes: (1) the fact that Ms. Zavala's investigation was primarily SAR related; and (2) the fact that Mr. Collins was the only one to deeply investigate the Freeze itself. But these points ignore the Agreement and the way in which it informs BANA's implied covenant-based duties. *See Centurion Air Cargo, Inc.*, 420 F.3d at 1151 (explaining that a breach of the implied covenant of good faith and fair dealing "attaches to the performance of a specific contractual obligation"). Nothing in the Agreement limits BANA's

22

right to conduct a "complete investigation of the [A]ccount" in a way that involves both SAR and freeze-specific matters. 30 business days, moreover, is not an unreasonable amount of time to complete these tasks. *See Intertech Trading Corp. v. JP Morgan Chase Bank, N.A.*, No. 17-21091-CIV, 2017 WL 7792705, at *6 (S.D. Fla. Aug. 28, 2017) (finding no breach where the contract contained "no requirement [that] frozen funds in an account be returned within a 30-day period").

The remaining portion of the Freeze investigation is not actionable either. As Matthew Young (a BANA fraud detection employee) explained, "888 holds" like the Freeze at issue here are placed automatically for 60-days for various reasons:

> Q. At the time the 888 hold was placed on this account, where was the perceived risk of loss; was it to the customer themself, the bank?
>
> A. At the time, certainly there was risk for potential third-party fraud, meaning there is a potential victim as well as potential account abuse, so both factors were present when the fraud -- I'm sorry, when the Financial Center called our Fraud-In-Progress line.
>
> Q. And when you say potential victim, what do you -- who do you mean by that?
>
> A. Like, so part of the concern was the rapid movement of money, large dollars from other institutions and movement of that fund -- movement of that funds out of the bank in similar rapid fashion, and so the Financial Center teammate conveyed to my analyst that concern, and given that, in most cases, you have about 60 days where a victim at another institution would identify and potentially report fraudulent activity, that the rapid movement of money outside the bank would keep us from being able to pay claims by that other institution, and so that was a factor here where the activity was large dollar amounts being moved from outside the bank into the bank and then outside the bank again.

23

Q. As it relates to the 888 hold here, did your department oversee the hold -- well, you indicated there were two 888 holds; correct?

A. Correct.

Q. There was a risk 888 hold and then a legal 888 hold; fair?

A. Correct.

Q. And the legal 888 hold was placed after the risk hold had cleared; correct?

A. Correct.

Q. So pertaining to the risk hold, was that under the purview of your department through its entirety?

A. The holds are intended to default to 60 days, and part of the reason is that, like I said, it may take up to 60 days for investigation to be completed, as well as to allow for potential claims to be filed by other institutions, and so my analyst placing that hold by default would account for that dynamic to play out, but during the course of the hold being placed, other departments were reviewing the account for risk.

Q. And so if I'm following -- and I don't know where you're getting the 60 days from. Is that based on some sort of industry standard, or it seems like you're pretty confident that's the time frame. I just want to know where you got that information?

A. Yeah. So this particular -- the 888 hold is placed automatically for 60 days, meaning that unless it's removed, it will default to 60 days and expire at that point. The reason for that policy is that per Uniform Commercial Code, Nacha, Regi, laws, rules and regs. Part of the reason that that time frame is considered reasonable and acceptable is that it allows for, number one, an investigation to occur in a reasonable amount of time. Number two, that's about how much time another institution has to report a claim by their client. So because of its broad application, the 60-day time frame is considered reasonable for those reasons.

Dkt. S-129-10 at 18. As previously explained at length, the risks indicated by Mr. Young were present in this case. It was not unreasonable for BANA to complete its investigation by waiting for possible third-party claims where both Mr. Collins and Ms. Zavala reasonably concluded that the account demonstrated suspicious activity and neither recommended closing the account or lifting the Freeze.

The only opposition WWCI offers on this point is the testimony of its expert, James Kreig. Mr. Kreig claims that BANA's "FDOD believes itself to be on some kind of 'mission from God' to zealously protect [BANA] and [BANA's] customers from fraud and to prevent those same customers from perpetrating frauds against [BANA] or others without any reasonable cause to believe that any form of fraud is actually taking place." Dkt. S-128-1 at 12.  In the midst of offering numerous inappropriate legal conclusions, Mr. Kreig also opines that "[n]o 'investigation' by a bank into a transaction or series of transactions in a customer's account takes 60 business days," *id.* at 25, and that BANA had no reason to suspect that any of the Account's activity was improper, *id.* at 25–34.

This unreliable testimony ignores the record and fails to create a material issue of fact. Federal Rule of Evidence 702 provides that expert testimony must be "based on sufficient facts or data" and that expert opinions must "reflect a reliable application of the principles and methods [used] to the facts of the case." Mr. Kreig's report achieves neither. The notion that no reasonable investigation takes

60-days is baseless conjecture and is contradicted by caselaw. *See Tracy v. PNC Bank, N.A.*, No. 2:20-CV-1960, 2024 WL 665227, at *2, 6 (W.D. Pa. Feb. 16, 2024) (finding no breach of the implied covenant of good faith and fair dealing concerning a 60-day freeze where "the account-holder agreement gave PMC Bank the right and discretion to freeze and withdraw the disputed [money] after an investigation"). The notion that BANA had no reason to suspect wrongdoing is refuted by the record. And the notion that BANA's FDOD believed itself to be on some "mission from God" apparently stems from a cherry-picked reading of the deposition testimony gathered from BANA employees. The Court is under no obligation to accept these conclusory statements. *James v. Potter*, No. 6:04-CV-1750-ORL-31-KRS, 2006 WL 8421309, at *1 (M.D. Fla. Nov. 3, 2006) (explaining that the "party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by the facts"); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (noting that the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value").

Additionally, even if viewed favorably, Mr. Kreig's report fails to create a material issue of fact as to BANA's good faith in maintaining the Freeze. Instead of meaningfully addressing the universe of factors that informed BANA's decision to provide additional time for possible third-party claims, Mr. Kreig merely

suggests, with post-hoc 20-20 hindsight, that such a decision cannot be reasonable because BANA would not have been liable if it had unfrozen the Account prior to a third-party claim being made. Dkt. S-128-1 at 25–29. This legal conclusion ignores the commercial reasonableness of attempting to protect third-party rights and business relationships with other financial institutions who employ similar practices. It consequently cannot sustain Count II where WWCI presents no affirmative evidence that BANA exercised its discretion in bad faith.

Finally, the Court finds that any issues raised in relation to the Hold cannot support an implied covenant claim. The Eleventh Circuit "has held that a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Centurion Air Cargo*, 420 F.3d at 1152. WWCI has not alleged an express breach of the Agreement related to the Hold and the Court has already found that no express breach occurred. Furthermore, unlike WWCI's other implied covenant theories, WWCI's newly stated Hold-based claims do not pertain to any discretionary aspects of the Agreement. Summary judgment is granted on Count II.

### c. Damages

Counts II and III also fail because the only damages asserted by WWCI are precluded by the Agreement. It is well established that Florida law expressly allows for contractual limitations on consequential damages "unless the limitation

or exclusion is unconscionable." Fla. Stat. § 672.719; *see also TYR Tactical, LLC v. Protective Prod. Enterprises, LLC*, No. 15-CV-61741, 2016 WL 10647315, at *6 (S.D. Fla. Oct. 13, 2016) (explaining that "Florida courts and courts in this circuit have routinely upheld exculpatory clauses barring consequential damages in breach of contract cases"), *aff'd*, 711 F. App'x 968 (11th Cir. 2017). Here, the Agreement specifically provides that BANA is "not liable for special, incidental, exemplary, punitive or consequential damages of any kind[,]" Dkt. 42-1 at 64, and WWCI makes no unconscionability arguments. WWCI's "diminution of value" damages, moreover, are unquestionably consequential in nature because they essentially constitute lost profits from the said mining venture. *Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.*, 193 F. Supp. 3d 1294, 1309 (S.D. Fla. 2016) (noting that "[d]amages for lost profits, loss of reputation, and loss of goodwill all constitute consequential damages"). Summary judgment is therefore appropriate for this reason as well.[7]

### III.   Promissory Estoppel (Count IV)

The final issue to consider is whether a material issue of fact exists as to WWCI's notice-related promissory estoppel claim. "Under Florida law, the doctrine of promissory estoppel comes into play where the requisites of a contract

---

[7] WWCI does not argue that its damages are direct in nature but instead argues that "Florida does not allow such broad disclaimers as to banks." Dkt. 161 at 9. This proposition is wrong. Provisions similar to the one at issue here have been upheld to bar consequential damages in relation to banks. *See Gilbert & Caddy, P.A.*, 193 F. Supp. 3d at 1309.

are not met, yet the promise should be enforced to avoid injustice." *Verbal v. TIVA Healthcare, Inc.*, 628 F. Supp. 3d 1222, 1234 (S.D. Fla. 2022) (cleaned up) (citation omitted). It follows that "[p]romissory estoppel is not available as a remedy when the parties have a written contract addressing the relevant issues; the contract's silence about particular detail is not controlling as long as the contract purports to address broadly the disputed issues." *Univ. of Miami v. Intuitive Surgical, Inc.*, 166 F. App'x 450, 454 (11th Cir. 2006).

In the instant case, the Court has already found that the Agreement controls the issue of freeze-related notices. Accordingly, because this is the only issue raised by WWCI, promissory estoppel is unavailable. The Court grants BANA summary judgment on Count IV.

## CONCLUSION

It is hereby **ORDERED** and **ADJUDGED**: BANA's Motion for Summary Judgment (Dkt. 118; Dkt. S-129) is **GRANTED**. The Clerk is directed to enter judgment in BANA's favor and close this case.

**DONE AND ORDERED** at Tampa, Florida, on June 20, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record